552 So.2d 1329 (1989)
Michelle Reneé DEMAREST
v.
PROGRESSIVE AMERICAN INSURANCE COMPANY, et al.
Consolidated With
William PETRIE
v.
William L. FEIBLEMAN, et al.
Consolidated With
Michelle Reneé DEMAREST
v.
PROGRESSIVE AMERICAN INSURANCE COMPANY, et al.
Consolidated With
William PETRIE
v.
William L. FEIBLEMAN, et al.
Nos. 89-CA-22, 89-CA-23, 89-CA-371 and 89-CA-372.
Court of Appeal of Louisiana, Fifth Circuit.
November 15, 1989.
*1330 Clarence F. Favret, III, J. Paul Demarest, Favret, Favret, Demarest & Russo, New Orleans, for plaintiff-appellee Michelle Reneé Demarest.
Geoffrey P. Snodgrass, Christovich & Kearney, New Orleans, for defendants-appellants William L. Feibleman and U.S. Fire Ins. Co.
Robert T. Garrity, Jr., Patricia N. Jackson, Harahan, for plaintiff-appellee William Petrie.
Before KLIEBERT, GAUDIN and WICKER, JJ.
KLIEBERT, Judge.
This litigation arises out of a two-car collision on July 4, 1986 at Causeway Boulevard, involving a 1983 Oldsmobile Cutlass owned and operated by William L. Feibleman and a 1984 Toyota Celica owned and operated by William H. Petrie. The only passenger in the Feibleman automobile was Michelle Reneé Demarest and the only passenger in the Petrie automobile was Paula J. Occhipinti. Demarest, Occhipinti, and Petrie brought separate suits against Feibleman and his automobile liability insurance carriers, Progressive American Insurance Company (Progressive), the primary insurer, and United States Fire Insurance Company (USFIC), the excess insurer, for damages allegedly resulting from the accident, including punitive or exemplary damages.
The claim of Paula J. Occhipinti was settled before the trial and her suit dismissed, therefore, her claim is not involved in this appeal. The others were consolidated for a jury trial.
On November 14, 1988, based on the jury verdict, judgment was entered in favor of Michelle Demarest for $163,667.00, computed as $127,007.00 compensatory and $40,000.00 exemplary damages, less $3,340.00 penalty assessed for failure to wear a seatbelt. On November 18, 1988, also based on the jury verdict, judgment was rendered in favor of William Petrie for $123,358.00, computed as $83,358.00 compensatory and $40,000.00 exemplary damages. The respective judgments awarded legal interest on all damages from date of judicial demand. The damages awarded together with the interest due thereon have been paid or deposited in the court except for the prejudgment interest on the exemplary damage awards. Progressive has fulfilled its obligation as the primary carrier and hence is not a party to the appeal.
Feibleman and USFIC perfected a suspensive appeal assigning as error solely the imposition of prejudgment interest on the exemplary damage awards on both judgments. Petrie perfected a devolutive appeal and urges the inadequacy of the damage award. Demarest answered Feibleman's and USFIC's appeal and also perfected a devolutive appeal, alleging inadequacy of the damage award and error in imposing a 2% penalty under LSA-R.S. 32:295.1(E) for failure to wear a safety belt. All appeals have been consolidated here.
Thus, the issues for our consideration on the appeal are: (1) the adequacy of the award to Demarest, (2) the adequacy of the *1331 award to Petrie and (3) the validity of imposing prejudgment interest on the exemplary damage awards. We have considered these issues in the order listed under a heading designated as such. For the reasons stated under those headings we find the jury committed manifest error in setting the amount of Ms. Demarest's general damage award and in failing to award to Mr. Petrie an amount for future medical expenses. Further, we find the trial judge erred in calculating the amount of the penalty assessed against Ms. Demarest for failure to use the seatbelt, but affirm its computation of prejudgment interest on exemplary damages. Accordingly, we amend the judgment to provide a total award to Ms. Demarest of $213,467.00, and a total award to Mr. Petrie of $138,358.00 and, as so amended, affirm the trial court's judgment.

FACTS RELATIVE TO ACCIDENT
On July 3, 1986, William Feibleman, Michelle Demarest and Barbara Delchamps went out celebrating, first to Southern Yacht Club, and then to the Inn of Five Happiness for a birthday party. All three consumed alcoholic beverages.
Mr. Feibleman began drinking about 5:00 P.M. on July 3, 1986 and continued to drink at the various social functions throughout the evening. On the way home, Ms. Demarest had fallen asleep on the front seat and was not wearing her seatbelt. They dropped Ms. Delchamps off at her home, then proceeded to bring Ms. Demarest home. Mr. Feibleman turned onto Causeway Boulevard, a four-lane divided highway which is a major artery in Jefferson Parish, and proceeded southbound in the northbound lane. After traveling over two overpasses, Feibleman crossed over the median and proceeded northbound in the southbound lane. He again crossed the Interstate 10 overpass and was approaching the Veterans Boulevard overpass when he struck the automobile being driven by William Petrie head-on. Petrie was entering Causeway Boulevard on the approach ramp from Veterans Boulevard and was attempting to "merge" when the collision occurred. Deputy Dennis Thornton of the Jefferson Parish Sheriff's office saw Feibleman's vehicle traveling on the wrong side of the roadway and witnessed the accident. Feibleman was arrested for driving while intoxicated and subsequently pleaded guilty as charged. The impact of the collision demolished both cars.

QUANTUMMS. DEMAREST
The jury computed the damage award to Ms. Demarest as follows:

Past, future, mental and physical pain
and suffering $ 75,000.00
Permanent disability 25,000.00
Past medical expenses 27,007.00
 ___________
 Total Compensatory 127,007.00
Exemplary Damages under LSA-C.C.
Article 2315.4[1] 40,000.00
 ___________
 Total Damages 167,007.00
Less 2% Penalty LSA-R.S. 32:295.1(E)[2] 3,340.00
 ___________
 Judgment $163,667.00

*1332 On appeal counsel for Ms. Demarest urges a compensatory damage award of at least $197,000.00 (an additional $95,000.00 in general damages), and an exemplary damage award of at least $100,000.00 (an increase of $60,000.00). He further contends it was error to assess the 2% penalty.
We have made a careful review of the record and note that Ms. Demarest sustained a severe ten-inch laceration to her head and a two-inch laceration to her forehead, a fractured bone in her right hand, a fractured ankle, a perforated intestine, residual scarring of the head and abdomen, and bruises to her body.
Following the accident Ms. Demarest was rushed to the emergency room ("E.R.") at East Jefferson Hospital. There was medical testimony that soon after she arrived, her blood pressure dropped to an extremely low level causing a critical life or death situation. Although she was in great pain, she could not be given morphine or dilaudid as pain medications because it could detrimentally affect her blood pressure. Due to the low blood pressure a central venous pressure (CVP) line was placed in her neck to monitor blood volume status. This CVP line and two IV lines in her arms were used to give her blood. Because the blood pressure did not stabilize and for fear Ms. Demarest might go into shock, Dr. Barbara Valvo elected to operate on the ten-inch laceration extending from the front to the back of her head and the two-inch laceration on her forehead. Half of Ms. Demarest's head was shaved for the operation. After lifting the scalp off the skull, Dr. Valvo found two severed arteries which accounted for the extreme amount of blood loss and low blood pressure. After surgery, Ms. Demarest was sent to the intensive care unit ("I.C.U.") so she could receive intensive monitoring because her condition was still critical. She needed monitoring for the drain to her head, the CVP line in her neck, the nasal gastric tube down her nose and into her stomach, as well as the catheter. Ms. Demarest recalls feeling very frightened that she might die and her mother attested to the fact that she needed constant reassurance that she would not die. She was not transferred to a regular hospital room until six days after the accident.
Ms. Demarest testified that she felt constant pain in her head from the minute she woke up. Her head felt like it had been ripped out and put back together, that it throbbed and did not feel like her head.
While her hair grew back over the next few months and currently helps camouflage the residual scar on her scalp and forehead, for about six months Ms. Demarest had to wrap her head with long sashes to hide her partially shaved head whenever she went out in public. Understandably, this was particularly upsetting to a young woman attending college. She apparently stopped wearing the head coverings around January of the year following the accident.
With regard to the injury to Ms. Demarest's right hand, according to the medical testimony she suffered a small non-displaced fracture at the fifth metacarpal which required a splint on her hand. Her hand especially hurt during the first few weeks while she learned to use crutches, since she put all of her weight on her hands. This resulted in some difficulty in writing for a time. In fact, after she returned to L.S.U., she continued to wear her hand cast at night after she had written with and used her right hand all day; towards the end of the day, her hand would tire.
Ms. Demarest's fractured left ankle required surgery to screw in place the ends of the fractured bone in her ankle. From the minute she awakened in the E.R., her ankle throbbed with pain and she could find no position which eased the pain. According to medical testimony, her foot cast was removed after two months but swelling and tenderness continued for some three *1333 months after the accident. In 1987, the pin was surgically removed in an out-patient procedure and resulted in soreness for several weeks. Dr. George Byrum explained that in foot injuries such as hers, symptoms such as stiffness, soreness, and swelling could possibly last for eighteen months to two years before reaching a stable state. At trial, Ms. Demarest agreed that her ankle had healed but testified that her ankle continued to swell and hurt when she did certain activities, such as aerobics and wore high heels.
Ms. Demarest's abdomen was also a source of extreme pain for a long time. Before her head surgery, the doctors, fearing major internal injuries because of tenderness and extreme pain, performed a laparotomy to check for internal bleeding. Although the fluids were pink, indicating surgery was not necessary, due to repeated complaints of severe pain, exploratory surgery was performed on Ms. Demarest's abdomen on July 10, 1986, six days after the accident. She testified that the pain felt like something was burning a hole through her stomach. She screamed for pain medicine and she was given medication which only relieved the pain for fifteen minute intervals. This continued for eight hours prior to surgery. In the course of the surgery, the surgeon located a ruptured small intestine and repaired it. She was not discharged from the hospital until ten days following the abdominal surgery.
As a result of the abdominal surgery Ms. Demarest has a rather large residual abdominal scar running from the breastbone to the pubic bone. She explains how it still hurts sometimes (when she is tired it starts to feel like it's pulling). The scar imposes a severe retriction on what she can wear. She is prevented from wearing certain fashionable clothes, such as, bikinis, midriff-baring tops, etc., without displaying the scar. Further she testified that as a result of this scar she feels defective, like she is less of a woman since it is very unattractive. She feels upset about the scar because it will always be with her; she will never be able to forget the accident. Ms. Demarest testified, and her plastic surgeon confirmed, Ms. Demarest is not interested in plastic surgery because the surgery runs the risk of having the scar cheloid (thicken) and affords only limited relief.
As a result of the injuries, Ms. Demarest remained in the hospital for sixteen days, six days of which were in the intensive care unit and ten days in a regular room. After her discharge from the hospital, her mother testified Ms. Demarest was in quite a bit of pain and had difficulty moving around because of her injured ankle and hand and trying to move with the incision on her stomach. Her mother recalls she was basically house-ridden for four to six weeks after her discharge and the only thing she did was attend physical therapy sessions to get instructions on how to use her crutches.
As a result of the accident, Ms. Demarest also had to drop out of summer school at U.N.O. where she had just completed her mid-term exam. She decided, however, to return to L.S.U. for the fall semester. She arrived at L.S.U. about one week after it started. Physically, she could not be on her own. The broken hand and ankle, coupled with the stomach surgery, hindered her ability to use crutches. Friends helped her get around where her mother left off. Although she was still in pain, she did not want to miss school, so she did the best she could under the circumstances.
In support of his contentions, counsel for Ms. Demarest has ably and eloquently shown the pain, suffering, and mental anguish undergone by Ms. Demarest, particularly during the first few weeks following the accident. Additionally, we readily understand Ms. Demarest's concern over the disfigurement from the scalping and residual scars of the head and abdomen.
In Gagnet v. Zummo, 487 So.2d 721, 723 (5th Cir.1986) this Court stated:
"In determining whether an award of damages is inadequate or excessive we must first inquire whether the jury's *1334 award for particular injuries and their effect upon the injured person was a clear abuse of the trier of fact's "much discretion." On appellate review it is only after an articulated analysis of the facts discloses an abuse of discretion that an award may for stated reasons be considered either excessive or insufficient. Only after making a determination of abuse can an appellate court disturb the award and then only to the extent of lowering it or raising it to the highest (or lowest) point which is reasonably within the discretion afforded that judge or jury. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977); Bourgeois v. Bill Watson's Investments, Inc., 458 So.2d 167 (La.App. 5th Cir. 1984)."
After reviewing the testimony and given the seriousness of the injuries, and thus the occasion for extreme mental anguish, the extreme physical pain of long duration without the ability to relieve same with the use of pain-killing chemicals, the extent and nature of the physical injuries, and the future mental anguish from the residual scars, in our view the jury committed manifest error in setting the general damage award at $75,000.00. We further find that an award of $125,000.00 would more reasonably compensate Ms. Demarest for her general damages under the particular facts and circumstances of this case and will amend the award to her accordingly. We do not feel, however, that the jury abused its discretion in deciding not to award damages for future cosmetic surgery.
The jury was instructed that after considering the nature and extent of harm to the plaintiff, the wealth or financial situation of the defendant, and the extent to which defendant's conduct offends a sense of justice and propriety, it was within its discretion to award exemplary damages. Since there is no absolute standard or schedule set out in the legislation, a discretionary ruling under LSA-C.C. Article 1999[3] was appropriate. Moreover, in reviewing exemplary damages, we are bound by the same rule applicable to a review of general damages, that is, to reverse a lower court's judgment, we must find a clear abuse of the trier of fact's great discretion. Bauer v. White, 532 So.2d 506, 510 (1st Cir.1988).
Here the defendant, Feibleman, had voluntarily consumed sufficient alcohol intoxicants to cause him to lose normal control of his mental and physical faculties at the time of the accident. His consumption of alcohol was a cause in fact of the accident and constituted a wanton and reckless disregard of the rights and safety of others. Clearly, therefore, exemplary damages should be awarded. Given the facts here, however, we cannot say the jury abused its discretion in concluding an award of $40,000.00 was adequate exemplary damages.
Under the provisions of LSA-R.S. 32:295.1(E), the jury reduced Ms. Demarest's award by 2%. The evidence at trial showed the seatbelt was in working order, but Ms. Demarest failed to use it. Because her injuries resulted from striking the dashboard and windshield, failure to wear the seatbelt clearly contributed to her injuries, justifying the jury's assessment of the full 2% reduction in the amount awarded for Ms. Demarest's failure to mitigate damages. However, this 2% reduction only applies to compensatory damages. It does not apply to an exemplary damage award.
Based on the foregoing we revise and compute the award to Ms. Demarest as follows:

Past and future mental and physical
pain and suffering $ 125,000.00
Permanent disability 25,000.00
Past medical expenses 27,007.00
 ___________
 Total $177,007.00

*1335
Less 2% for failure to mitigate pursuant
to LSA-R.S. 32:295.1(E) $ 3,540.00
 ___________
 Total Compensatory Damages $173,467.00
Exemplary damages under LSA-C.C.
Article 2315.4 40,000.00
 ___________
 Total Damages $213,467.00

QUANTUMPETRIE
The jury computed the damage award to Mr. Petrie as follows:

Past and future mental and physical
pain and suffering $ 60,000.00
Permanent disability 10,000.00
Past medical expenses 13,358.00
 ___________
 Total Compensatory Damages $ 83,358.00
Exemplary Damages under LSA-C.C.
Article 2315.4[4] 40,000.00
 ___________
 Total $123,358.00

Counsel for Petrie argues that the compensatory damages should be increased by $75,000.00 ($60,000.00 increase in general damages and $15,000.00 for future medicals). He also argues for exemplary damages of $100,000.00 (a $60,000.00 increase).
The same standard of review discussed under the caption "QuantumMs. Demarest" is applicable here.
We have made a careful review of the record and note the following: According to Dr. Courtney Russo, an orthopedic surgeon and the current treating physician, Mr. Petrie sustained a cervical sprain, lumbar sprain, a perforation and fracture of the sternum, fracture of the right second rib, a broken nose and cut lip.
Mr. Petrie was discharged from the hospital after four days and thereafter remained confined to his home for one and a half weeks. He was given muscle relaxers and pain pills to ameliorate his condition. His treatment was conservative and encompassed physical therapy, heat, a soft collar for his neck, and in-home traction. Although his injuries gradually healed, he contends he has a residual disability of his cervical spine as a result of the injuries sustained in the accident here sued on.
At trial, Mr. Petrie testified that he underwent a cervical fusion, performed by Dr. Carlos Gorbitz, a neurosurgeon, in 1985, prior to the accident here sued on. He testified the surgery was a success and relieved the problems he previously had regarding strength in his arms and hands. Then in a November 1985 car accident he re-injured his neck but, by the time of the accident here sued on, that had also cleared. Now, as a result of the July 4, 1986 accident, he claims he has recurrent cervical spine problems provoking his present neck pain and arm and hand weakness.
Mr. Petrie contends a seizure he suffered in December 1986 while undergoing tests in the hospital was a result of the accident sued on. Mr. Petrie was diagnosed as an epileptic in 1983 by Dr. Donald Richardson, a neurological surgeon, who felt this condition was congenital as Petrie had a history of childhood seizures as well as three seizures in the preceding year (1982). Additionally, no brain injury occurred as a result of this accident as Petrie remained conscious and suffered no amnesia after the accident.
At trial, the neurosurgeon who performed the 1985 cervical fusion, Dr. Gorbitz, testified that when Mr. Petrie came to him, he complained that for three years he had been suffering from neck pain and weakness and numbness in his arms. Dr. Gorbitz's findings in 1985 included muscle wasting in the shoulders, arms and hands, with a significantly weak right hand grip, similar to present findings. Although the extensive surgery performed in 1985 was considered a success, Mr. Petrie continued to experience a weak hand grip and weakness of the intrinsic hand and finger muscles. Mr. Petrie visited Dr. Gorbitz and, as *1336 late as January 1986, complained of neck pain and clicking sounds in his neck which he attributed to a November 1985 car accident.
Mr. Petrie's treating physician, Dr. Russo, also testified at trial. He said he first saw Mr. Petrie in December 1985, following a November 1985 car accident. Mr. Petrie was advised to see his neck surgeon concerning all of his neck complaints, since he apparently felt neck pain immediately thereafter. Dr. Russo diagnosed a cervical strain/sprain and noted a slight weakness in Mr. Petrie's right hand grip as a result of the November 1985 accident. In May 1986, two months before the July 4th accident, Mr. Petrie complained to Dr. Russo that his neck was still bothering him and that he had cracking/popping in his spine and neck.
Dr. Russo saw Mr. Petrie on July 11, 1986, a few days after the subject accident. His principal complaints included his cervical spine, headaches, and pain in his shoulders. During subsequent visits, Dr. Russo noted that both hands were much weaker and he was very concerned about the continued deterioration, especially in the right hand. At this time, Dr. Russo noticed for the first time that Mr. Petrie's muscles were atrophying (weakening and shrinking) in his right hand. He suggested an evaluation be done to determine if surgery might halt the deterioration. When asked about future surgery, Dr. Russo opined that if Mr. Petrie's neurological deficit progressed, he felt surgery would be necessary.
An evaluation was done in November 1986 by Dr. Michael Carey, a neurosurgeon, who testified at trial via his deposition. Mr. Petrie gave a history to Dr. Carey, including the 1985 neck surgery and the car accident on July 4th, 1986, but failed to mention his interim November 1985 car accident. Test results evidenced a bone strut, which was previously replaced during his 1985 neck surgery, indenting the sack around the cervical spinal cord and putting pressure on it. Dr. Carey proposed surgery, as the cause of Mr. Petrie's muscles wasting away was due to pressure on the spinal cord which was aggravated by the July 4th accident. Because of the serious risks involved, Mr. Petrie solicited a second opinion.
Mr. Petrie saw Dr. Edward Connolly, a neurosurgeon, on December 31, 1986 for a second opinion concerning the necessity of surgery. The doctor testified at trial via his deposition. Dr. Connolly performed no tests, but instead interpreted the test results performed in December 1986 as well as the earlier January 1986 test results. Dr. Connolly opined that Mr. Petrie's cervical spinal cord was normal without constriction, and felt Mr. Petrie suffered a cervical sprain as a result of the July 4th accident.
Dr. Connolly admitted in his deposition that he could not tell if there was a neurological change by looking at Mr. Petrie and at his old records. Regarding further surgery, Dr. Connolly felt that unless he showed progression of his neurological findings, further surgery should not be done.
Dr. Russo continued to see Mr. Petrie up until the time of trial. Dr. Russo testified that on December 11, 1987, about one year after Dr. Connolly's evaluation, he found that Mr. Petrie's muscles were atrophying more in the upper right extremity and that his hand was much worse, much weaker. At that time, he stated the neurological findings in the right upper extremity were progressing downhill. Dr. Russo concluded that Mr. Petrie's problems were a direct result of the July 4th accident and that there was no way to avoid future surgery. He added that post-operative recovery would last about four to six months. He estimated the total cost at from $12,000.00 to $15,000.00.
In Wells v. Allstate Ins. Co., 510 So.2d 763, 767-768 (1st Cir.1987), the court addressed the concern of the weight to be given to the testimony of a treating versus a non-treating physician and based on a considerable line of cases concluded: "It is well settled that the testimony of the treating *1337 physician is entitled to greater weight than the testimony of a physician who examines the patient only once or twice."
As a rule, Dr. Russo's testimony, as the treating physician, is entitled to greater weight than Dr. Connolly's, since he was more familiar with Mr. Petrie's neurological progression.
After carefully reviewing all of the evidence under the appropriate standard and considering the treating physician's certainty Mr. Petrie's condition is deteriorating and will need future surgery, we find that the jury erred in deciding that future surgery would not be necessary and therefore failed to include an award for future surgery. Rather, the preponderance of the evidence indicates Mr. Petrie's neurological findings have worsened since he last saw Dr. Connolly and the probability of future surgery is virtually certain. Since Dr. Russo estimated the cost of surgery at between $12,000.00 and $15,000.00, we find an award of $15,000.00 would reasonably compensate Mr. Petrie for a future surgery and will amend the judgment in his favor accordingly. We do not feel, however, that the jury abused its discretion in awarding Mr. Petrie $83,358.00 for the remaining compensatory damages. Additionally, for the same reasons stated under the caption "QuantumMs. Demarest" we cannot say that the jury abused its discretion in awarding exemplary damages. Therefore, the judgment will be affirmed in all other respects.

PREJUDGMENT INTEREST ON EXEMPLARY DAMAGES
The trial judge awarded prejudgment interest on the entire damage awards. Defendants appeal from that portion of the judgment ordering them to pay prejudgment interest on the exemplary damages awarded. By doing so, they raise a res nova issue in Louisiana, i.e., whether prejudgment interest is recoverable on an award of exemplary damages. We hold that it is.
Defendants argue that pursuant to LSA-R.S. 13:4203, an award of prejudgment interest on the exemplary damages is contrary to the language and intent of that statute and, therefore, this part of the judgment is erroneous and should be reversed. We disagree.
The narrow question before us here is whether the judgment of the court below is one that the courts of Louisiana would view as "sounding in damages, ex delicto" within the intendment of LSA-R.S. 13:4203.[5] Defendants argue that this statute was enacted in 1916, at a time when there was no basis in law for an exemplary damages award and, therefore, the statute is inapplicable to exemplary damages. While the statute was enacted in 1916, long before exemplary damages were permissible, in our view the statute does not exclude exemplary damages from prejudgment interest. The damages contemplated by LSA-R.S. 13:4203 encompassed all damages "ex delicto." The core codal article covering delicts or torts is LSA-C.C. Article 2315.[6]
The legislature by the passage of Act 511 of 1984 enacted Civil Code Article 2315.1 to enlarge the kinds of damages recoverable to now include exemplary damages where the defendant's intoxication is a cause in fact of the plaintiff's injury. Rather than placing this amendment separate and apart, adding it to the primary tort article indicates that exemplary damages are damages "ex delicto" within the *1338 intendment of the prejudgment interest statute, LSA-R.S. 13:4203. Moreover, the legislature did not include language in the amendment to direct when interest would commence to run; nor did it amend LSA-R.S. 13:4203 to specifically provide from when interest would commence to run on exemplary damages.
As stated in Creech v. Aetna Casualty & Surety Company, 516 So.2d 1168, 1171 (2nd Cir.1987), "There is no doubt that the exemplary damages contemplated by LSA-C.C. Article 2315.4 are awarded because of injuries. `Injuries' is a predicate for the article to become applicable." In the case at bar, it is not disputed that injuries have occurred to Michelle Demarest and William Petrie.
A brief review of the historical objectives of LSA-R.S. 13:4203 is found in American Cyanamid Co. v. Electrical Industries, 630 F.2d 1123, 1129-30 (5th Cir.1980) which illustrates that "its purpose was to liberalize the judicial approach to legal interest in tort cases, not to impose new restrictions where none had existed before."
That court points out that prior to the enactment of LSA-R.S. 13:4203 in 1916, Louisiana courts generally held interest would run from the date of judgment in tort cases, because at the time, the awarding of interest on unliquidated claims was prohibited. However, after this prohibition was lifted by repealing the article mandating it, Louisiana courts continued to apply the "unliquidated claims" rule to restrict the running of legal interest in tort cases to the date of judgment. (Citations omitted) Id.
When R.S. 13:4203 was enacted in 1916 the legislature effectively liberalized the approach to legal interest in tort cases by creating a substantive right to such interest in tort plaintiffs and then requiring that this interest run from the date of judicial demand. (Citations omitted). Id.
In the case at bar, Michelle Demarest and William Petrie are tort plaintiffs who bring their suits in tort. The judgments encompassing compensatory and exemplary damages are based on defendants' tort liability and, hence, arise ex delicto. Therefore, we find that they fall within the class of judgments that LSA-R.S. 13:4203 was designed to affect.
Further, to hold that the prejudgment interest contemplated in LSA-R.S. 13:4203 encompasses both compensatory and exemplary damages would not only compensate a victorious victim for the loss of the use of funds that were not available at the time the tort was committed, but also act as an incentive to settlement or at least encourage the defendant to reduce the claim to judgment expeditiously.
Defendants argue that exemplary damages are synonomous with penalties and that penalties are beyond the scope of LSA-R.S. 13:4203. But, see Creech, supra, "deterrence is one of the complex of purposes that is said to lie at the heart of all tort law, not merely that aspect labeled `punitive.'"
Additionally, Louisiana courts have previously held that legal interest is properly awarded on penalties and attorney's fees arising under certain statutes. For instance, in Coulton v. Levitz Furniture Corporation, 391 So.2d 80 (4th Cir.1980), the trial judge awarded a claimant legal interest from the date of judicial demand on penalties and attorney's fees arising in a worker's compensation case. Similarly, in another worker's compensation case, George v. Marcantel Feed Stores, Inc., 446 So.2d 345 (3rd Cir.1984), the court awarded legal interest on attorney's fees from date of judicial demand. In Negem v. Paul Revere Life Insurance Company, 366 So.2d 194 (2nd Cir.1978), the court held that legal interest was properly awarded on penalties and attorney's fees imposed under LSA-R.S. 22:657, a statute concerning the prompt payment of claims arising under health and accident contracts issued in this state, even though the statute did not expressly provide for this. The Negem court explained its rationale as follows:
"Although we are unable to find any jurisprudence dealing with the issue of *1339 whether legal interest may be awarded on penalties and attorney fees imposed under La.R.S. 22:657, our research reveals that interest has been awarded on the 12% penalty provision and attorney fees imposed under La.R.S. 22:658, which deals with payment of claims under policies other than life, health and accident. Baghramain v. MFA Mutual Ins. Co., 315 So.2d 849 (La.App. 3rd Cir.1975) (writ denied 320 So.2d 207, 209 (La. 1975)); Doty v. Central Mutual Ins. Co., 186 So.2d 328 (La.App. 3d Cir.1966) (writ denied 249 La. 486, 187 So.2d 451 (1966); Roberts v. Houston Fire & Casualty Co., 168 So.2d 457 (La.App. 3d Cir.1964). This statute, like R.S. 22:657, does not expressly provide for legal interest. Analogizing from this jurisprudence, we find the insurer should be required to pay legal interest upon the penalties and attorney fees provided for in La.R.S. 22:657."
Id. at 196, 197.

CONCLUSION
For the reasons above stated the trial court's judgment of November 14, 1988 in favor of Michelle Demarest is amended to award a total of $177,007.00 less 2% for failure to mitigate pursuant to LSA-R.S. 32:295.1(E) for net compensatory damages of $173,467.00 and $40,000.00 for exemplary damages, with interest to run on both awards from the date of judicial demand until paid. Additionally, the judgment of November 18, 1988 in favor of William H. Petrie is amended to award a total $98,358.00 for compensatory damages and $40,000.00 for exemplary damages with interest to run on both awards from the date of judicial demand. In all other respects the judgment of the trial court is to remain the same. As so amended, the judgment of the trial court is affirmed. Costs of the appeal are to be borne by the defendants-appellants.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] Civil Code Article 2315.4 provides as follows:

"In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries."
[2] The applicable 1986 version of LSA-R.S. 32:295.1(E) provided as follows:

"In any action to recover damages arising out of the ownership, common maintenance, or operation of a motor vehicle, failure to wear a safety belt in violation of this Section shall not be considered evidence of comparative negligence. Failure to wear a safety belt in violation of this Section may be admitted to mitigate damages, but only when the party offering such evidence proves that:
(1) There was a functioning safety belt available to the injured party;
(2) The injured party failed to use a safety belt;
(3) The failure to use a safety belt contributed to the party's injuries;
(4) The use of a safety belt would have reduced the injured party's damages in an amount equal to or in excess of the amount of mitigation sought. In no event shall the award of damages be reduced by more than two percent for the nonuse of a safety belt."
[3] LSA-Civil Code Article 1999 provides as follows:

"When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages."
[4] See footnote 1.
[5] LSA-R.S. 13:4203 provides as follows:

"Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto,' which may be rendered by any of the courts." (Emphasis supplied).
[6] LSA-C.C. Article 2315 provides as follows:

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person."